**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No. 1:17-cr-213** |
| DAVID HARRIS MILLER, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

At issue in this mail and wire fraud, money laundering conspiracy, and identity theft prosecution is whether the Government improperly seized defendant's assets without probable cause to believe those assets will ultimately be proved at trial to be forfeitable as tainted, and not substitute assets. This issue has been fully briefed and argued and is ripe for disposition.

## I.

A procedural history of this case and the companion case of *United States v. Wallis* provides necessary context for the factual findings here.[1] On October 5, 2015, the Government charged Linda Diana Wallis ("Wallis") by information with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1349. Wallis waived indictment, pled guilty to the one-count amended criminal information, and signed a statement of facts on October 15, 2015. Specifically, the statement of facts noted that from January 2013 through February 2014, in the Eastern District of Virginia, Wallis and her husband, the defendant here who was unindicted at the time, engaged in a conspiracy to obtain money through false statements and misleading representations from three different victim organizations, including

---

[1] Both parties expressly incorporate their briefing, argument and the facts developed in the *Wallis* ancillary proceedings in their arguments in *Miller*.

SkyLink Air and Logistic Support, Inc. ("SkyLink"), the Saslaw for State Senate campaign, and the Community College Consortium on Autism and Intellectual Disabilities ("CCCAID").[2] Specifically, the statement of facts reflects that Wallis and defendant created two fake law firms, Federal Legal Associates ("FLA") and The Straile Group. *Wallis* SOF ¶ 10. Wallis and defendant then engaged FLA and The Straile Group on behalf of SkyLink and in so doing, caused SkyLink to transfer purported legal fees approximating $368,400 to a Capital Bank account and a PNC Bank account under Wallis's control. *Id.* ¶¶ 11-18. With respect to the Saslaw for State Senate campaign, the statement of facts discloses that Wallis served as treasurer of the campaign from June 2013 until September 2014, and in that time, caused approximately 73 fraudulent checks, totaling $653,000, to be issued to the same Capital Bank and PNC Bank accounts she controlled, as well as a Capital Bank account under both Wallis's and defendant's joint control. *Id.* ¶ 21. Wallis also authorized approximately $482,000 in transfers from CCCAID's bank account to bank accounts that Wallis and defendant controlled from April 2010 until August 2014. *Id.* ¶ 29. Wallis and defendant then used these funds to pay for their personal expenses, including interest payments on a loan secured by their Virginia home, improvements to a beach home, and charters of private flights.

After entering her guilty plea, Wallis was sentenced on March 18, 2016 to 56 months in the custody of the Bureau of Prisons. A Consent Order of Forfeiture, issued on the same day, included a money judgment against Wallis for $1,429,599, the amount of illegal proceeds that Wallis obtained as a result of the conspiracy, and ordered the forfeiture of two properties in partial satisfaction of that money judgment. *See United States v. Linda Wallis*, No. 1:15-cr-285

---

[2] Although the statement of facts Wallis signed describes the crimes against all three of the victim organizations, *see United States v. Linda Wallis*, No. 1:15-cr-285 (E.D. Va. Oct. 15, 2015) (Statement of Facts) ("*Wallis* SOF"), the one count criminal information to which Wallis pled guilty refers only to the fraud against SkyLink, *see United States v. Linda Wallis*, No. 1:15-cr-285 (E.D. Va. Oct. 6, 2015) (Amended Criminal Information).

(E.D. Va. Mar. 18, 2016) (Consent Order of Forfeiture). Specifically, the March 18 Forfeiture Order named two properties: (1) 4551 Forest Drive, Fairfax, Virginia ("Virginia Property"); and (2) 2896 Indian Harbor Drive, Unit 3, Bethany Beach, Delaware ("Delaware Property"). *Id.* at 2. Defendant had purchased both properties before defendant and Wallis were married and before the charged conspiracy began, and Wallis was not a title owner on either property at that time. Significantly, however, Wallis was a signatory on the $600,000 note held by Dan Caplan ("Caplan note") and secured by the Virginia Property in 2007. The March 18 Forfeiture Order specified that both the Virginia and the Delaware properties were to be forfeited as "property that is traceable to, derived from, fungible with or a substitute for property that constitutes the illegal proceeds of the conspiracy to commit wire fraud." *Id.*

On April 18, 2016, defendant, who was at the time still unindicted and unrepresented, filed a Motion for Relief, requesting removal of a *lis pendens* filed against the Virginia Property, and also moved for an ancillary hearing pursuant to Rule 32.2(c)(1), Fed. R. Crim. P. and 21 U.S.C. § 853(n)(2), asserting that he was sole owner of the Virginia Property and the Delaware Property and as such, these properties were not forfeitable as a part of Wallis's case. With respect to defendant's Motion for Relief, a hearing was held on May 6, 2016. Following the hearing, an Order issued ordering the transfer of the net proceeds owed to defendant from the sale of the Virginia Property to the United States Marshal Service ("USMS") upon closing of the sale of that property on May 11, 2016. *See United States v. Linda Wallis*, No. 1:15-cr-285 (E.D. Va. May 6, 2016) (Order). The USMS was instructed to hold these proceeds, pending the disposition of defendant's petition for an ancillary hearing. *Id.* At closing, the Virginia Property sold for $1,150,000. Of the $1,150,000, $686,062.50 was used to pay off the value of the Caplan

note, and the remaining $313,550.82, the amount owed to defendant, was transferred to the USMS in accordance with the May 6 Order.

With respect to defendant's motion for an ancillary hearing, defendant gained representation on May 19, 2016. The parties subsequently filed four sets of briefs, and three hearings were held on December 16, 2016, March 24, 2017, and June 9, 2017. During the ancillary proceedings, the Government presented documentary evidence and testimony from Stacy Young, an FBI forensic accounting expert. Specifically, Young testified that she had traced $338,140.60 in proceeds from Wallis and defendant's fraud to the Virginia property[3] and $58,818.35 in criminal proceeds to the Delaware Property. To conduct her tracing analysis, Young testified that she reviewed bank records from the Capital Bank and PNC bank accounts under Wallis and defendant's control. Young then traced funds originating with the various victim organizations to payments associated with the Virginia and Delaware properties. In particular, Young traced funds embezzled from SkyLink, CCAID, and the Saslaw for Senate campaign, to payments made to Daniel Caplan, the holder of the Caplan note secured by the Virginia Property. And, with respect to the Delaware property, Young traced fraud funds to payments to Herl's Bath and Tile, Lansing Building Products, and CLM General Contracting LLC. The parties stipulated that Herl's Bath and Tile, Lansing Building Products, and CLM General Contracting LLC provided services and improvements to the Delaware Property.

On September 20, 2017, defendant was indicted by a Eastern District of Virginia grand jury on one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, one count of conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h), three counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342, three counts of wire

---

[3] Specifically, the Government traced $286,559.83 in fraud proceeds to payments on the Virginia Property and also calculated that it was entitled to $51,580.77 in appreciation on the fraudulent investment in the Virginia Property.

fraud, in violation of 18 U.S.C. §§ 1343 and 1342, and two counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 1028A(a)(2). Indictment (Doc. 1) at 1. With respect to the money laundering count, the grand jury found probable cause to believe that defendant and Wallis transferred and laundered funds through multiple financial accounts or bogus entities. The Indictment charges that defendant and Wallis then used a portion of these laundered proceeds to fund purchases for the Virginia and Delaware properties. For example, the Indictment alleges that on August 3, 2012, Wallis instructed Capital Bank to transfer funds from CCAID to her personal account before making a payment to Dan Caplan for the Virginia Property and before making a payment to Herl's Bath and Tile for improvements to the Delaware property. *Id.* ¶ 117. Shortly thereafter, the Indictment alleges that on August 23, 2012, Wallis directed Capital Bank to route funds from CCAID through multiple bank accounts before making payments on the Virginia Property. *Id.* ¶ 118. And on February 26, 2013, the Indictment alleges that Wallis instructed Capital Bank to transfer $10,000 from the FLA account to Wallis and defendant's personal account to cover a check for the Delaware Property. *Id.* ¶ 120. Accordingly, the grand jury found probable cause to believe that the Delaware Property and the net proceeds from the sale of the Virginia Property were subject to forfeiture as properties involved in a money laundering offense and traceable to both money laundering and the underlying fraud. *Id.* at 37. Following the grand jury's Indictment, the Government filed a new *lis pendens* on the Delaware Property and on the proceeds from the sale of the Virginia Property.

Thereafter, on January 3, 2018, defendant filed the Motion for Release of Funds at issue here. Defendant's arguments in support of this motion are essentially similar to the arguments he advanced in the ancillary proceedings in Wallis's case, namely that the funds from the Virginia and Delaware properties are not traceable to proceeds from the charged criminal offenses and

thus are not tainted and cannot be seized pre-trial. Along with his motion, defendant also attached an affidavit, averring that he had no unexhausted assets, apart from the seized assets, with which to fund his legal defense in this case. The Government disputes defendant's arguments with respect to the properties, contending both (i) that the properties were involved money laundering and (ii) that the properties are traceable to laundered money and the underlying fraud proceeds. As a result, the Government contends that the assets were properly seized pending trial. The Government also contests the validity and the credibility of defendant's affidavit, arguing that there is no credible or reliable evidence that defendant has no other assets with which to fund his legal defense in this case.

Two hearings were held on this Motion for Release of Funds on February 16, 2018 and February 22, 2018. In the course of these hearings, the Government presented additional testimony from Young, the FBI forensic accounting expert. Young adopted her testimony from the *Wallis* hearings with respect to tracing and testified that, through additional analysis, she was able to identify nine additional transactions involving the Virginia Property and to trace a total of $315,317.10 to the Virginia Property, excluding appreciation. Feb. 16 Hearing Tr. (Doc. 40) 40:24-41:6, 53:23-54:2. These additional transactions included transfers used to pay property taxes on the Virginia Property and to install fixtures in the home. Young also described how several of the transactions identified in the money laundering count of defendant's Indictment demonstrated that the Virginia and Delaware properties were involved in money laundering. For example, with respect to the August 3, 2012 transaction, Young testified that she was able to trace funds embezzled from CCAID to a $8,500 payment on the Caplan note for the Virginia Property and a $10,000 payment for improvements to the Delaware Property. Young read into the record emails from Wallis describing each of these transactions. Specifically, on August 3,

2012, Wallis emailed a Capital Bank employee, asking him to transfer $8,500 to Dan Caplan and $10,000 to Herl's Bath and Tile. *See id.* at 62:16-22. The Capital Bank employee responded to Wallis, informing her that CCAID was the only account with sufficient funds to process the request and asking her whether he should "do everything from there or transfer enough funds to your personal and do them from there." *Id.* at 63:10-15. The documentary evidence presented at the hearing reflects that Wallis, in turn, instructed the Capital Bank employee to "[t]ransfer to personal and do them there." *Id.* at 63:17. Young testified at the February 16 hearing that in her opinion, the fact that Wallis deliberately transferred funds through her personal account before making payments suggested she intended to conceal ownership and origin of the fraud funds from both the government and the recipients of the funds. *Id.* at 61:8-18.[4]

Young also testified that the Virginia and Delaware properties facilitated the money laundering conspiracy. Specifically, Young testified that more than 50 emails related to the conspiracy were sent from the Virginia Property and that four fake email addresses were accessed from the residence. *Id.* at 67:12-24. Moreover, Wallis was located in the Delaware Property when she sent several of the emails directing transfers of funds from the victim organizations, through her personal accounts, and then to various vendors. *Id.* at 70:3-15.[5]

---

[4] The Government presented additional evidence with respect to the August 23, 2012 transaction as well. Specifically, Wallis emailed a Capital Bank employee on August 23, 2012, asking that employee to transfer $23,000 from the CCAID account to the FLA account and then to transfer $25,000 from the FLA account to the Caplan note. From her review of the record, Young testified that she was able to trace these corresponding transactions through Wallis and defendant's accounts.

[5] Young also testified concerning her comparison of defendant's bank records to defendant's affidavit filed in support of his Motion for Release of Funds. Based on her review, Young determined that many of the statements in defendant's initial affidavit were false. For example, defendant stated that he earned $1,000 per month in social security, but his bank records revealed that in reality, defendant collected more than $4,000 per month in social security checks. And although defendant averred that he spends $3,000 per month on childcare, his accounts do not contain any transactions reflecting these payments. Moreover, defendant averred that he did not have any unexhausted assets with which to fund his legal defense, but Young identified several undisclosed sources of funds. For example, the Government revealed that defendant received a $352,000 credit to his USAA account in 2016 and a $182,000 credit in the first half of 2017. The Government also identified an undisclosed mutual fund containing more than $50,000. Finally, defendant's USAA Account Summary Schedule also revealed that between September,

Following the conclusion of the two hearings, the parties submit supplemental briefing on these issues. As such, these issues have been fully briefed and argued and are ripe for disposition.

## II.

It is well-settled, and the parties do not dispute, that the Government has the authority to restrain certain assets of a criminal defendant prior to trial even where the defendant needs those assets to fund his legal defense. *United States v. Monsanto*, 491 U.S. 600, 615-16 (1989). Specifically, the Government may seize or restrain property prior to trial "based on a finding of probable cause to believe that the property will ultimately be proved forfeitable." *Id.* at 615.[6] In this respect, the Fourth Circuit has made clear that there must be probable cause to believe the assets seized are directly forfeitable as tainted assets connected to the crime; the Government may not restrain substitute assets that are in no way linked to the crime. *United States v. Chamberlain*, 868 F.3d 290, 297 (4th Cir. 2017) (holding that "Section 853(e) does not by its terms permit pretrial restraint of substitute assets"). Probable cause in this context, as in others, is "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. $95,945.18, U.S. Currency*, 913 F.2d 1106, 1110 (4th Cir. 1990) (quoting *United States v. $364,960 In U.S. Currency*, 661 F.2d 319, 323 (5th Cir. Unit B 1981)). In other words, probable cause requires that there is a "fair probability", not certainty

---

1, 2015 and July 31, 2017, defendant received $71,597.39 in deposits from rentals of the Delaware Property with a net profit of approximately $32,000 in 2016 alone.

Although this testimony certainly casts doubt on defendant's affidavit, in the end, it is unnecessary to decide whether defendant has established that he needs the seized funds to hire legal counsel because the Fourth Circuit has held that pretrial restraint of untainted assets is illegal, regardless of whether the assets are necessary for a legal defense. *United States v. Chamberlain*, 868 F.3d 290, 297 (4th Cir. 2017). The question whether defendant needs the funds at issue for his legal defense simply affects whether there is an additional Sixth Amendment concern associated with the pretrial restraint of the assets and adds to the urgency of the motion.

[6] *See also Kaley v. United States*, 134 S. Ct. 1090, 1095 (2014) ("In *Monsanto*, our principal case involving this procedure, we held a pre-trial asset restraint constitutionally permissible whenever there is probable cause to believe that the property is forfeitable. That determination has two parts, reflecting the requirements for forfeiture under federal law: There must be probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." (internal citations omitted)).

that the restrained assets are subject to forfeiture. *Kaley*, 134 S. Ct. at 1103 ("Probable cause . . . is not a high bar. It requires only the fair probability on which reasonable and prudent people, not legal technicians, act.").[7]

Applying these principles, the Supreme Court has recognized that criminal defendants have a limited opportunity to challenge the pretrial restraint of assets pursuant to a grand jury's indictment. Specifically, although a defendant may not challenge the grand jury's determination that the defendant committed the offense charged, the defendant may challenge the grand jury's determination that the seized property is sufficiently related to the crime or crimes charged in the indictment. *Kaley*, 134 S. Ct. at 1103. In this regard, a defendant is entitled to the release of funds seized pretrial if evidence reveals that the government seized substitute assets without probable cause to believe those assets were subject to forfeiture as tainted assets. *See United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001) (citations omitted).[8] Accordingly, the question presented here is whether the Government seized the Virginia Property and the Delaware Property with probable cause to believe those assets were subject to forfeiture as tainted assets.

## III.

Analysis of this question properly begins with consideration of the statutes defining the crimes charged and authorizing forfeiture with respect to these crimes. The grand jury indicted

---

[7] *See also In re Restraint of Bowman Gaskins Financial Group*, 345 F. Supp. 2d 613, 620-21 (E.D. Va. 2004).

[8] The Fourth Circuit in *Farmer* also required the defendant to show that the defendant needs these same seized assets to pay for counsel and present a defense. Importantly, *Farmer* was decided prior to *Chamberlain* at a time when Fourth Circuit precedent allowed the government to seize substitute assets prior to trial as long as those assets were not necessary to pay for legal counsel. *United States v. McKinney (In re Billman)*, 915 F. 2d 916 (4th Cir. 1990), *overruled by Chamberlain*, 868 F.3d 290. Because *Chamberlain* specified that the government is not permitted to seize substitute assets prior to trial, regardless of whether those assets are needed to retain and pay for counsel and a defense, defendant here is not required to prove that he needs the seized assets to pay for counsel to be entitled to a release of funds. At the same time, if there is probable cause to believe the seized assets will ultimately be proved forfeitable as tainted assets, not substitute assets, the government is entitled to restrain the assets pretrial, regardless of whether defendant needs the assets to pay for his legal defense.

defendant for, among other things, mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Specifically, the Indictment charges that defendant and Wallis conspired to commit money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957. Section 1956 prohibits, *inter alia*, knowingly conducting a financial transaction involving proceeds of "specified unlawful activity" for the purpose of concealing the nature of those proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). And § 1957 prohibits knowingly engaging in "a monetary transaction in criminally derived property of a value greater than $10,000." 18 U.S.C. § 1957(a).

Where, as here, a defendant is indicted for mail or wire fraud, "any property, real or personal, which constitutes or is derived from proceeds traceable to" the offense is forfeitable. 18 U.S.C. 981(a)(1)(C). Moreover, a defendant charged with money laundering, in violation of 18 U.S.C. §§ 1956(h), is required to forfeit "any property, real or personal, involved in [a transaction or attempted transaction in violation of section 1956 or 1957] . . . , or any property traceable to such property[.]" 18 U.S.C. § 982(a)(1). Courts have consistently interpreted the phrase "involved in" in § 982(a)(1) broadly to include the money or property being laundered as well as property used to commit or to facilitate the money laundering offense or the underlying unlawful activity.[9] And importantly, property involved in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property. *See United States v. Kivanc*, 714 F.3d 782, 794-85 (4th Cir. 2013) ("[W]hen legitimate funds are

---

[9] *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005); *United States v. Puche*, 350 F.3d 1137, 1153-54 (11th Cir. 2003); *United States v. McGauley*, 279 F.3d 62, 76 n. 14 (1st Cir. 2002); *United States v. Baker*, 227 F.3d 955, 965 (7th Cir. 2000); *United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999); *United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D. N.Y. 2005) (citing cases).

commingled with property involved in money laundering . . . . , the entire property, including the legitimate funds, is subject to forfeiture.").[10]

For the reasons described below, the evidence adduced during the February 16 and February 22 hearings on this matter discloses that there is probable cause to believe the Virginia and Delaware properties were "involved in" the money laundering conspiracy and, in part, "traceable to" the money laundering conspiracy and the underlying fraud charged in the Indictment. Accordingly, the properties are forfeitable pursuant to §§ 982(a)(1) and 981(a)(1)(C) and are properly subject to pretrial restraint. Defendant's Motion for Release of Funds must therefore be denied.

## A.

To begin with, the Indictment and the evidence in this case make clear that the Virginia and Delaware properties were seized with probable cause to believe the properties were "involved in" a money laundering conspiracy, and as such, defendant is not entitled to release of these properties, even if he intends to use the funds therefrom to pay for his legal defense.

Here, the grand jury found there was probable cause to believe both the Virginia and the Delaware properties were involved in defendant and Wallis's money laundering conspiracy based on a series of transactions identified explicitly in the Indictment. Specifically, the grand jury found that funds, derived from defendant's and Wallis's fraud, were laundered through several bank accounts, and then used to make payments on the properties, including (i) interest

---

[10] *See also United States v. One Single Family Residence Located at 15603 85th Ave. N., Lake Park, Palm Beach Cnty., Fla.*, 933 F.2d 976, 981 (11th Cir. 1991) (noting that if one is a wrongdoer, "any amount of the invested proceeds traceable to drug activities forfeits the entire property"); *United States v. Gardenhire*, 2017 WL 6371362, at *11 (W.D. Pa. Dec. 13, 2017) (following *Kivanc* and holding that property improved with drug proceeds as part of money laundering conspiracy is forfeitable in its entirety even if some of the equity is derived from untainted sources); *United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 252 (E.D. Va. 1993) (holding that car is involved in the money laundering offense and is forfeitable in its entirety even if legitimate funds are used to make other payments where some car payments are §§1956 and 1957 financial transaction).

payments on the Caplan note for the Virginia Property, (ii) payments for property taxes on the Virginia Property, (iii) payments to install fixtures in the Virginia Property, and (iv) payments for improvements to the Delaware Property. Based on these transactions, the grand jury found there was probable cause to believe that the Virginia and Delaware properties are forfeitable as property involved in the money laundering conspiracy.

The evidence presented by the Government over the course of the two hearings on this question supports the grand jury's probable cause finding that both the Virginia and the Delaware properties were involved in a conspiracy to commit money laundering offenses in violation of §§ 1956 and 1957. Specifically, with respect to the § 1956 offense alleged in the Indictment, the Government introduced evidence via the FBI forensic accounting expert of the financial transactions underlying each of the payments into the Virginia and the Delaware properties. Specifically, the evidence from Wallis's emails and bank records discloses that Wallis embezzled funds from the SkyLink, CCAID, and Saslaw accounts and then moved some fraud funds through the FLA bank account, deliberately transferred other funds via various personal accounts, and made numerous other unusual financial moves before making payments related to the Virginia and Delaware properties. *See* Feb. 16 Hearing Gov't Exs. 1-5.[11] The FBI forensic accounting expert testified that the structure of these transactions involving the Virginia and Delaware properties indicates, as required to establish a § 1956 offense, that Wallis intended to conceal the origin or source of the fraud funds in each of her transactions. *See* Feb. 16 Hearing Tr. 61:8-18. This evidence is thus sufficient to support the grand jury's probable cause determination that the Virginia and Delaware properties were "involved in" a conspiracy to launder money in violation of § 1956.

---

[11] Because defendant is charged with conspiracy to commit money laundering offenses, as well as conspiracy to commit wire and mail fraud, substantive offenses committed by Wallis, defendant's co-conspirator, in furtherance of the conspiracy, are attributable to defendant. *See Pinkerton v. United States*, 328 U.S. 640, 645-46 (1946).

And with respect to the § 1957 offense alleged in the Indictment, the FBI forensic accounting expert testified that she identified several transactions of more than $10,000 where fraud proceeds were transferred into personal bank accounts and then transferred to the Delaware and Virginia properties. For example, the documentary evidence presented at the February 16 hearing reveals that on June 6, 2012, Wallis transferred $22,500 from the CCAID bank account to Herl's Bath and Tile to fund improvements to the Delaware property. Feb. 16 Hearing Gov't Ex. 1. Moreover, the FBI forensic accounting expert testified that on August 23, 2012, Wallis instructed Capital Bank to transfer $23,000 from CCAID to FLA and then $25,000 from FLA to the Caplan note. Feb. 16 Hearing Tr. 71:1-72:4. These transactions of more than $10,000 of criminally derived proceeds establish probable cause to believe the Virginia and Delaware properties were "involved in" a conspiracy to launder money, in violation of § 1957.

The Government also adduced evidence that both properties were "involved in" a money laundering conspiracy insofar as defendant and Wallis used the properties to facilitate both the underlying fraud and the money laundering offenses. In this regard, the FBI forensic accounting expert testified that defendant and Wallis accessed four different fake email accounts more than 100 times and sent at least 50 fraudulent emails in support of their fraud from the Virginia Property. *Id.* at 67:12-24. Moreover, the testimony disclosed that Wallis sent instructions to various bank representatives to move funds between various personal accounts while located in the Delaware Property, thereby facilitating the money laundering offense. *Id.* at 72:5-15. These properties are therefore also forfeitable based on the fact that Wallis and defendant used the properties to facilitate both the money laundering conspiracy and the underlying fraud. *See, e.g.,* *United States v. George*, 761 F.3d 42, 60 (1st Cir. 2014) (holding that vehicle in which defendant

planned the money laundering offense was forfeitable as facilitating property because defendant met there, rather than in his law office, to be free from "prying eyes and ears").

In sum, there is sufficient evidence to support the grand jury's probable cause finding that the Virginia and Delaware properties were "involved in" a conspiracy to commit launder money in violation of §§ 1956 and 1957. Accordingly, defendant's Motion for Release of Funds must be denied on this ground alone.

Defendant attempts to undermine this probable cause finding in three ways, but, for the reasons that follow, none of these attempts is successful. To begin with, defendant argues that the properties were not involved in money laundering because neither of the properties were purchased with tainted funds. Although this is a true statement, defendant's reliance on this fact to prevent pretrial seizure misstates and misunderstands the law. To be sure, if a money laundering offense is committed through a purchase or sale of property, the property is "involved in" the offense. *See One 1987 Mercedes Benz 300E*, 820 F. Supp. at 252 (holding that car was forfeitable where payments made to purchase the car were transactions in violation of § § 1956 and 1957). But property is "involved in" a money laundering offense even when it is not purchased through that offense. Courts in this circuit and elsewhere have consistently found that where, as here, laundered money is used to fund improvements to a property or to make other payments associated with a property like payment of property taxes or payments on a real estate loan, that property is "involved in" the money laundering offense. *See, e.g.*, *United States v. Myers*, 21 F.3d 826, 831 (8th Cir. 1994) (finding that real property was "involved in" money laundering and subject to forfeiture pursuant to § 982(a)(1) when the laundered money was spent

toward improvements on the property and payments on real estate contract).[12] Nor does the Government need to trace the investments to increased equity in the property for the property to be forfeitable as property involved in a money laundering offense; it is sufficient for the payments to go toward improvements to the property, taxes on the property, or loans secured by the property.[13] To conclude otherwise would essentially amount to an invitation to would-be money launderers to immunize their fraud proceeds by taking out loans and making interest only payments. Accordingly, defendant's arguments in this respect must fail.

Defendant's next argument is two-fold; defendant argues (i) that there is no evidence that defendant's purpose in making the payments described in the Indictment was to conceal the origin of the fraudulent funds; and (ii) that the transactions identified in the Indictment were simply fraudulent transfers, not money laundering transactions. As a result, defendant contends that these transactions cannot support a charge of conspiracy to commit money laundering offenses in violation of §§ 1956 and 1957.[14] But these arguments are inappropriate at this stage. In *Kaley v. United States*, the Supreme Court recognized that pretrial seizure of assets requires two probable cause findings: (1) that "the defendant has committed an offense permitting forfeiture;" and (2) that "the property at issue has the requisite connection to that crime." *Kaley*,

---

[12] *See also United States v. Beltramea*, 849 F.3d 753, 760 (8th Cir. 2017) (finding property was "involved in" money laundering based on the fact that laundered funds were used to make improvements to the property); *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (finding premises were "involved in" money laundering where laundered fraud proceeds were used to pay the companies' monthly lease and tax expenses); *In re 650 Fifth Ave. and Related Props.*, 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011) ("[R]eal [p]roperty is involved in a money laundering offense if laundered funds are used . . . to pay for improvements." (citations omitted)); *United States v. 10.10 Acres Located on Squires Road in Cheeks Tp., Orange Cty., N.C.*, 386 F. Supp. 2d 613, 616 (M.D.N.C. 2005) ("Real property is involved in a money laundering offense if laundered funds are used . . . to pay for improvements.").

[13] *See, e.g.*, *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 565 (finding properties were "involved in" money laundering without calculating equity where Government alleged that defendants used proceeds to maintain and improve the properties)).

[14] Defendant's first argument—that there is no evidence of intent to conceal—in no way undermines the grand jury's probable cause finding with respect to the § 1957 violation, because that violation requires only a transaction of more than $10,000 and does not require intent to conceal.

134 S. Ct. at 1103. The *Kaley* Court held that where, as here, a defendant indicted by a grand jury challenges pretrial seizure of assets, the defendant can challenge only the latter of these probable cause determinations, not the former. In other words, as the Supreme Court has noted, defendants indicted by a grand jury "cannot challenge the grand jury's conclusion that probable cause supports the charges against them" because "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Id.* at 1098, 1105. In distinguishing between these probable cause determinations, the *Kaley* Court recognized that a determination that assets are sufficiently connected to an offense is "a technical matter far removed from the grand jury's core competence and traditional function," and as such, "a judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself." *Id.* at 1099 n.9. By contrast, to permit a defendant to challenge the grand jury's determination that there is probable cause to believe the defendant committed the offense would significantly "undermine the grand jury [and] create internal contradictions within the criminal justice system." *Id.*

Here, defendant argues that there is no evidence showing defendant intended to conceal the origin of fraud funds through the transactions identified in the Indictment and no evidence that the transactions were money laundering offenses, and not simply fraudulent transfers. In effect, defendant is contending that there is insufficient evidence to support the grand jury's determination that there is probable cause to believe defendant committed a money laundering offense through the transactions identified in the Indictment, precisely the type of argument the *Kaley* Court prohibited. Because this argument amounts to an impermissible challenge to the grand jury's determination that defendant committed the underlying money laundering offense, it is inappropriate at this stage and does not bar pretrial seizure of tainted property.

Even assuming, *arguendo*, defendant's argument were proper at this stage, it would nonetheless fail. Courts have noted that different types of evidence can support an inference that a defendant engaged in a transaction with an intent to conceal the source, origin, or ownership of funds, including "depositing illegal profits in the bank account of a legitimate business," "structuring the transaction in a way to avoid attention," "a series of unusual financial moves cumulating [sic] in the transaction," or "expert testimony on the practices of criminals." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 476 (10th Cir. 1994) (footnotes omitted).[15] Here, evidence adduced at the February 16 and February 22 hearings reveals that Wallis, in some instances (i) moved fraud funds through the FLA bank account before transferring to her personal bank account, (ii) deliberately transferred funds via various personal accounts, and (iii) made other unusual financial moves before making payments related to the Virginia and Delaware properties. *See* Feb. 16 Hearing Gov't Ex. 3,5. Moreover, the FBI forensic accounting expert also testified that the structure of the transactions involving the payments to the Virginia and Delaware properties indicated that Wallis intended to conceal the origin or source of the fraud funds through the various transactions. Feb. 16 Hearing Tr. 61:8-18. Thus, this evidence is sufficient to support the grand jury's probable cause determination that the Virginia and Delaware properties were "involved in" money laundering in violation of § 1956.

Defendant's final argument is that the fact that Wallis used her computer at home both to orchestrate the money laundering conspiracy and to commit the underlying fraud transactions does not mean the properties themselves facilitated the money laundering. In support of this argument, defendant cites to *United States v. One 1981 Jaguar XJ6*, 1993 WL 157630 (N.D. Ill. 1993). In that case, the defendant drove his Jaguar to the airport to perpetrate a money

---

[15] *See also United States v. Marshall*, 248 F. 3d 525, 539 (6th Cir. 2001) (adopting *Garcia-Emanuel* analysis); *United States v. Willey*, 57 F.3d 1374, 1384-85 (5th Cir. 1995) (same).

laundering offense using stolen credit cards and altered drivers' licenses. The district court there rejected the government's attempt to forfeit the Jaguar, finding that an asset must be "used more extensively in the underlying illegal conduct than merely as a means of commuting to and from the scene of illegal activity." *Id.* at *3. But importantly, the court noted that "if the police had found the laminating machine used to alter the driver's license in the Jaguar, a different result would undoubtedly follow." *Id.* at *3 n.2. Precisely this occurred here; in contrast to the facts in *One Jaguar*, the evidence here reveals that defendant actually engaged in both the underlying fraud and the money laundering conspiracy from the confines of the Virginia and Delaware properties, rather than simply using the homes to get to another location. As such, this case fits the exception noted in *One Jaguar* because the crime actually occurred inside of the seized asset—that is, the laminating machine was actually found in the Jaguar. As such, *One Jaguar* is distinguishable from the facts here, and indeed, supports the Government's position.

Defendant also cites *United States v. Two Tracts*, 998 F.2d 204 (4th Cir. 1993). To the extent this case is relevant,[16] it supports the Government's position here. The Fourth Circuit in *Two Tracts* concluded that a parcel of land between the site of a drug trafficking operation and a public road was not forfeitable, distinguishing prior Fourth Circuit precedent in *United States v. Schifferli*, 895 F.2d 987 (4th Cir. 1990). *Two Tracts*, 998 F.2d at 211-14. But this case is on all fours with *Schifferli*, not *Two Tracts*. In *Schifferli*, the Fourth Circuit found that a dentist's office was forfeitable because the dentist used the office more than forty times during a four-month period to write illegal prescriptions. *Schifferli*, 895 F.2d at 991. The evidence here, as in *Schifferli*, discloses multiple occasions during which the defendant used the premises in question to perpetrate the underlying criminal offense. *See, e.g.*, Feb. 16 Hearing Tr. 67:12-24. Thus, the

---

[16] *Two Tracts* involves forfeiture pursuant to 21 U.S.C. § 881(a)(7), and not 21 U.S.C. § 982(a)(1), the statute implicated here.

result here should be the same as *Schifferli*; because the premises were used to commit the fraud, they are subject to forfeiture.

In conclusion, the cases defendant cites do not alter the result reached here and in fact support the grand jury's determination that probable cause exists to believe the Virginia and Delaware properties facilitated both money laundering and the underlying fraud and thus were "involved in" the money laundering conspiracy charged in the Indictment.

In sum, the Government has provided sufficient evidence to show there is probable cause to believe the Virginia Property and the Delaware Property will ultimately be subject to forfeiture as properties "involved in" a money laundering conspiracy and defendant has failed to adduce any evidence that the Government seized untainted assets without probable cause. Accordingly, plaintiff's Motion for Release of Funds must be denied.

**B.**

Even assuming, *arguendo*, the Virginia and Delaware properties are not "involved in" a money laundering conspiracy, there is also probable cause to believe $315,317.10 of the Virginia Property and $58.818.35 of the Delaware Property are traceable to the money laundering conspiracy and to the underlying fraud. As such, these amounts are forfeitable, pursuant to 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C), as property "traceable to" an offense.

Where, as here, legitimate funds are commingled with fraud proceeds in a bank account, tracing rules allow courts to distinguish between legitimate and illegitimate funds and to track or trace the movement of illegitimate funds. In the Supreme Court's words, "the law has tracing rules that help courts . . . distinguish[] between a criminal defendant's (1) tainted funds and (2) innocent funds needed to pay for counsel." *Luis v. United States*, 136 S. Ct. 1083, 1095 (2016)

().[17] In a civil forfeiture action, the Second Circuit identified several of these tracing rules, including: (1) the "lowest intermediate balance" rule; (2) the "averaging" rule; and (3) the "drugs-in, first-out" rule. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986).[18] The Lowest Intermediate Balance Rule originated in trust law as a rule to determine the rights of a trust beneficiary to a trustee's bank account where the trust funds and the trustee's personal funds are commingled. *See* Restatement (Second) of Trusts § 202(1) cmt. j (1959). In this regard, the Rule assumes that the funds at issue remain in the account and are available to be traced provided that the balance does not fall below the amount of the disputed funds. In the event that "the balance of the account dips below the amount of [funds at issue], [the funds at issue] abate[] accordingly." *Sony Corp. of Am. v. Bank One*, 85 F.3d 131, 138 (4th Cir. 1996) (quoting *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill. 2d 257 (1982)). By contrast, the "averaging" rule considers a pro rata share of each withdrawal or asset purchased to be "traceable proceeds." *Banco Cafetero*, 797 F.2d at 1159. And the third, "drugs-in, first-out,"

---

[17] Defendant cites to *United States v. Voight*, 89 F.3d 1050 (3d Cir. 1996) for the proposition that the government cannot show that property is traceable to criminal proceeds where the proceeds are commingled with legitimate funds. Although this case may govern in the Third Circuit, it is not mandatory or persuasive authority here because the Fourth Circuit has expressly endorsed the application of tracing principles to track funds from commingled bank accounts in criminal forfeiture cases. *See, e.g., United States v. Moore*, 27 F.3d 969, 976-77 (4th Cir. 1994) (noting that legitimate and illegitimate funds, when commingled, "cannot be traced to any particular source, absent resort to accepted, but arbitrary, accounting techniques"). Moreover, as described above, the Supreme Court has endorsed the application of tracing rules in precisely the circumstances at issue here. *See Luis*, 136 S. Ct. at 1095 ("[T]he law has tracing rules that help courts" . . . "distinguish[] between a criminal defendant's (1) tainted funds and (2) innocent funds needed to pay for counsel").

[18] Courts in this circuit and elsewhere have applied these rules in the criminal forfeiture context. *See, e.g., United States v. Walsh*, 712 F.3d 119 (2d Cir. 2013) (applying the "drugs in, first out" approach in criminal forfeiture proceeding); *United States v. $88,029.08, More or Less, in U.S. Currency,* 2012 WL 4499084, at *4-5 (S.D. W. Va. Sept. 28, 2012) (applying the Lowest Intermediate Balance Rule in criminal forfeiture proceeding); *United States v. Capoccia*, 2009 WL 2601426, at *2-5 (D. Vt. Aug. 19, 2009) (applying Lowest Intermediate Balance Rule in criminal forfeiture case); *United States v. Corey*, 2006 WL 1281824 (D. Conn. May 9, 2006) (applying *Banco Cafetero* rules in criminal forfeiture context).

approach considers any one withdrawal or an asset purchased with one withdrawal to be "traceable proceeds," to the extent of the amount of the criminal proceeds in the bank account.

The Fourth Circuit applied the first rule—the Lowest Intermediate Balance Rule—to trace secured funds in *Sony Corp. of Am. v. Bank One*, 85 F.3d 131 (4th Cir. 1996). In that case, the defendant deposited $78,266.64 of disputed funds in a checking account. The next day, the defendant deposited an additional $250,000 of non-disputed funds into the checking account, and that same day, the defendant transferred $78,000 from the checking account to a savings account. The defendant there argued that the funds transferred to the savings account were not traceable to the original deposit of disputed funds, but the Fourth Circuit rejected that argument. In so doing, the *Sony* court made clear that pursuant to the Lowest Intermediate Balance Rule, "funds that are not spent but transferred to other accounts or used to purchase investments are identifiable as proceeds[.]" *Id.* at 139. The Lowest Intermediate Balance Rule simply requires that "if the balance of the account dips below the amount of deposited proceeds, the prior security interest in the identifiable proceeds abates accordingly[,]" and the balance is not increased if later, other funds are deposited in the account. *Id.* at 138. Based on these principles and application of the Lowest Intermediate Balance Rule, the Fourth Circuit found that the $78,000 transfer was traceable to the original deposit of $78,266.64 in disputed funds in the checking account, despite the influx of $250,000 before the transfer. *Id.* at 138-39.

These principles, applied here, compel the conclusion that the Government's forensic accountant in this case appropriately traced fraud proceeds and laundered property to payments made on the Virginia and Delaware properties. The Government's forensic accountant testified that she applied the Lowest Intermediate Balance Rule in her tracing analysis, and a careful review of her analysis suggests that her results are consistent with the principles described in

*Sony*. To begin with, consistent with the principles articulated in *Sony*, the forensic accountant traced fraud proceeds transferred between defendant's personal accounts and used to fund payments on the loan secured by the Virginia Property and improvements to the Delaware Property. At the same time, the FBI forensic accounting expert remained faithful to the Lowest Intermediate Balance Rule by abating the amount of identifiable criminal proceeds whenever the balance of the account dipped below the amount of the fraud proceeds. Consistent with the Lowest Intermediate Balance Rule, the FBI forensic accounting expert did not increase the amount of fraud proceeds if legitimate funds were later deposited in the account.[19] In sum, the FBI forensic accounting expert correctly applied the Lowest Intermediate Balance Rule, and as such, adequately traced criminal proceeds both to the Virginia and to the Delaware properties.

Transaction 16 in the FBI forensic accounting expert's tracing analysis is emblematic of the accountant's application of these principles. In Transaction 16, the forensic accountant traces $4,860.03 in fraud proceeds to the Virginia Property. The tracing occurs as follows:

- 6/27/2012- $10,000 of fraud proceeds are transferred from the CCAID account to the defendant's Capital Bank account;

- 6/28/2012- balance of defendant's Capital Bank account dips to $4,8603.03;

- 6/29/2012- $70,000 of legitimate funds are deposited into defendant's Capital Bank account;

- 7/2/2012- $70,000 is transferred from the defendant's Capital Bank account to the FLA account;

- 7/3/2012- $8,500 is transferred from the FLA account to the Caplan note.

---

[19] For example, assume $5,000 of fraud proceeds are deposited in an account and then later the account balance dips to $4,000. The amount of fraud proceeds traceable from the account is now reduced to $4,000 pursuant to the Lowest Intermediate Balance Rule. If an additional $10,000 of legitimate funds is deposited in the account, the amount of traceable fraud proceeds does not then increase beyond that $4,000 amount.

The forensic account concluded that only $4,860.03, and not the full $8,500 payment to the note holder, is traceable to fraud proceeds because the balance of the defendant's Capital Bank account dipped to $4,860.03 on June 28, 2012. Thus, the forensic accountant applied the Lowest Intermediate Balance Rule by accounting for the fact that some of the fraud funds dissipated. She then traced the $4,860.03 of remaining fraud funds to the $70,000 transfer to the FLA account and the subsequent investment in the note secured by the Virginia Property.

Defendant argues that the FBI forensic accounting expert failed to apply the Lowest Intermediate Balance Rule consistently because she traced fraud proceeds out of accounts when the rule presumes that legitimate funds always leave the account first.[20] But this construction of the Lowest Intermediate Balance Rule is inconsistent with the Fourth Circuit's application of the rule in *Sony*. In reaching its conclusion, the *Sony* court made clear that the Lowest Intermediate Balance Rule, quite apart from being a rigid rule requiring that fraud funds are always the last to leave an account, aims to "preserve[] the proceeds to the greatest extent possible as the account is depleted." 85 F.3d at 139. In this regard, "funds that are not spent but transferred to other accounts or used to purchase investments are identifiable as proceeds of the [criminal activity]," even when there are also legitimate funds in the account. *Id.* at 138. Applying these principles, the Fourth Circuit in *Sony* considered precisely the circumstances defendant describes, namely a disputed deposit was followed by a larger, undisputed and untainted deposit, and then a transfer out of the account. Based on these facts, the Fourth Circuit determined that a court could trace the disputed deposit from one account to the other, even though sufficient legitimate funds remained in the original account to cover the whole transfer. *Sony Corp.*, 85 F.3d at 138-39.

---

[20] For example, with respect to Transaction 16, defendant argues that because $70,000 of legitimate funds entered the Capital Bank account on June 29, 2012, the forensic accountant should have considered the July 2, 2012 transfer as consisting only of those legitimate funds. As described *infra*, the Lowest Intermediate Balance Rule does not mandate that legitimate funds are always the first to leave the account.

Defendant's argument is thus inconsistent with the Fourth Circuit's application of the Lowest Intermediate Balance Rule.

Moreover, even assuming the FBI forensic accounting expert did apply several different tracing rules, defendant points to no authority which requires the application of one, and only one, rule through an entire tracing procedure. To the contrary, courts have routinely recognized the need for flexibility in the application of tracing rules and the importance of applying tracing rules that reflect the reality of any transaction. *See, e.g.*, *Banco Cafetero Panama*, 797 F.2d at 1160-61 (noting that "[w]hich [tracing] approach reflects reality in any particular case will depend on the precise circumstances").[21] Indeed, in outlining the different types of rules, the Second Circuit in *Banco Cafetero* recognized that once fraudulent proceeds enter a bank account,

> there will be probable cause to believe that the bank account contains [those funds] (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such [funds] (if the withdrawal exceeds the deposit).

*Banco Cafetero*, 797 F.2d at 1160-61. Given that probable cause exists to believe that fraud funds exist both in the account and in the transfer, withdrawal or purchase, the Government is entitled, and indeed required, to apply the approach that better accords with the reality of the transaction and that "preserves the proceeds to the greatest extent possible as the account is depleted." *Sony Corp.*, 85 F.3d at 139.

Next, much like his argument with respect to property involved in money laundering, defendant argues that the properties were not traceable to property involved in a money laundering transaction or fraud proceeds because defendant did not purchase either of the properties with tainted funds. But again this argument mischaracterizes the law. For property to

---

[21] *See also In re Moffitt, Zwerling & Kemler, P.C.*, 875 F. Supp. 1152, 1160 (E.D. Va. 1995), *aff'd in part, rev'd in part sub nom. United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660 (4th Cir. 1996) ("In addition, overly rigid enforcement of arbitrary tracing rules invites avoidance, for if form dominates substance, persons with forfeitable property will soon learn the quickest way to launder their property of its traceable taint.").

be "traceable to" property involved in a money laundering offense, the criminal proceeds need not be used to purchase the property or to increase equity in the property. Rather, portions of a property are traceable to proceeds where the proceeds are used to make payments associated with the property, including payments on loans, property taxes, and payments for improvements to the property. *See, e.g.*, *United States v. Beltramea,* 160 F. Supp. 3d 1119, 1127 (N.D. Iowa 2016), *aff'd*, *Beltramea*, 849 F.3d 753 (finding funds were "traceable" to a laundering scheme where government traced funds to payments for improvements to property and payments on an overdue loan associated with the property).[22]

Here, the FBI forensic accounting expert's tracing analysis disclosed that Wallis and defendant used fraudulent proceeds and laundered money to make payments associated with the Virginia and the Delaware properties, including payments on the Caplan note secured by the Virginia Property, payments to fund improvements and to add fixtures to both properties, and payments of the property taxes on the Virginia Property. As such, there is probable cause to believe the funds identified are traceable to the money laundering and wire fraud offenses charged in the Indictment. And this result makes sense—defendant would not have had the improvements to the Delaware property absent the embezzled and laundered funds. And even though defendant paid only interest on the Virginia property loan, and did not pay down the principal of his mortgage on the Virginia Property, the fraud proceeds nonetheless enabled defendant to retain title to, and keep, his home. Had defendant not used the fraud proceeds to pay the interest on the Caplan note, defendant would have lost his home under the terms of the note.

---

[22] *See also United States v. Real Property and Premises Located at 216 Kenmore Ave.*, 657 F. Supp. 2d 1060, 1069 (D. Minn. 2009) ("There is no serious dispute that, by spending allegedly tainted funds on renovations and property taxes for [a property], the property is 'traceable to' a money-laundering offense" (citations omitted)).

In sum, the Government's evidence reveals that there is probable cause to believe that $315,317.10 from the Virginia Property and $58.818.35 from the Delaware Property are traceable to property involved in the money laundering conspiracy and the underlying wire fraud and are thus directly forfeitable pursuant to 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C). Accordingly, the Government's pretrial restraint of these funds is appropriate and defendant's Motion for Release of Funds must be denied.

### IV.

On September 20, 2017, a grand jury indicted defendant for, *inter alia*, a conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1957. As a part of the Indictment, the grand jury determined there was probable cause to believe that defendant's Virginia and Delaware properties were "involved in" the money laundering conspiracy or "traceable to" property involved in the money laundering conspiracy and the underlying fraud. Indictment 37. Over the course of two hearings, the Government adduced additional evidence to support the grand jury's probable cause determination, and defendant failed adequately to rebut this evidence. Accordingly, probable cause exists to believe these properties are forfeitable as tainted, not substitute, assets, and as such, the Virginia and the Delaware properties may be restrained prior to trial even assuming defendant needs the assets to fund his legal defense. For these reasons, defendant's Motion for Release of Funds must be denied.

Alexandria, Virginia
March 8, 2018

/s/

T. S. Ellis, III
United States District Judge