# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-CR-213 |
| | ) | |
| DAVID HARRIS MILLER | ) | |

## MEMORANDUM OPINION

On October 4, 2019, after hearing testimony from 29 government witnesses and from defendant, a jury convicted Defendant David Harris Miller of ten counts of a twelve-count indictment, including: (i) conspiracy to commit mail or wire fraud (Count 1); (ii) conspiracy to launder monetary instruments (Count 2); (iii) mail fraud (Counts 3-6); and (iv) wire fraud (Counts 7-10). The jury also returned a special forfeiture verdict finding: (i) that fraud proceeds in the amount of $315,317.10 from the sale of real property at 4551 Forest Drive, Fairfax, Virginia (the "Fairfax Property") were proceeds traceable to Counts 1 and/or 3-10; (ii) that fraud proceeds in the amount of $58,818.35 from real property at 28961 Indian Harbor Drive, Unit 3, Bethany Beach, Delaware (the "Bethany Beach Property") were proceeds traceable to Counts 1 and/or 3-10; and (iii) that the Fairfax and Bethany Beach Properties were involved in the money laundering offense charged in Count 2.

At issue now is the government's motion for a preliminary order of forfeiture entering a money judgment in the amount of $1,640,665 against defendant to be offset by the proceeds from the sale of the Fairfax and Bethany Beach Properties. Defendant opposed the government's motion.[1] After oral argument was heard, and a careful review of the record, this Memorandum Opinion grants the government's motion for the reasons from the bench and for the reasons stated below.

---

[1] Defendant filed a "motion in opposition," but defendant's pleading is intended to be his response in opposition to the government's motion and does not separately seek additional relief.

1

## I.

On September 20, 2017, a grand jury returned an indictment charging defendant with twelve counts: (i) conspiracy to commit mail or wire fraud (Count 1); (ii) conspiracy to launder monetary instruments (Count 2); (iii) mail fraud (Counts 3-6); (iv) wire fraud (Counts 7-10); and (v) aggravated identity theft (Counts 11-12).

On January 3, 2018, defendant moved for an order releasing the proceeds of the Fairfax Property and removing the notice of *lis pendens* from the Bethany Beach Property. After an evidentiary hearing, a memorandum opinion issued denying defendant's motion. *See United States v. Miller*, 295 F. Supp. 3d 690 (E.D. Va. 2018). The March 8, 2018 memorandum opinion held that there was probable cause to believe that the Fairfax and Bethany Beach Properties were "involved in" the money laundering conspiracy and, in part, "traceable to" the money laundering conspiracy and the fraud charged in the indictment. Defendant appealed that decision and the Fourth Circuit affirmed, holding that probable cause supported a finding that defendant "involved the properties in money laundering transactions by spending laundered funds to improve and retain them." *United States v. Miller*, 911 F.3d 229, 234 (4th Cir. 2018). The Fourth Circuit also held that the Fairfax and Bethany Beach Properties were "forfeitable because they are 'traceable to' laundered funds and funds obtained through fraud under § 981." *Id.*

On September 24, 2019, a jury trial began on the twelve-count indictment against defendant. The government presented 29 witnesses in its case-in-chief, including forensic accountant Stacy Young, who performed an accounting analysis tracing the proceeds of defendant's frauds into improvements and payments made with respect to two properties owned by defendant. On October 2, 2019, the government rested, and defendant moved for a judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P., solely with respect to the two counts of aggravated identity theft. The Court denied the motion, finding that, taking all of the evidence in favor of the government, the evidence was sufficient to sustain a conviction on the two aggravated identity theft counts.

At the beginning of defendant's case-in-chief on October 2, 2019, defendant called his wife, Linda Wallis Miller, as a witness.[2] Mrs. Miller's counsel appeared and invoked Mrs. Miller's spousal testimonial privilege and her Fifth Amendment privilege against self-incrimination. After hearing argument from the parties and from Mrs. Miller's counsel, the Court found that Mrs. Miller had validly invoked her spousal testimonial privilege and Fifth Amendment privilege against self-incrimination and therefore she could not be compelled to testify. Thereafter, defense counsel called defendant to testify and the trial proceeded.

On October 3, 2019, the jury began its deliberations. The next day, the jury returned a verdict finding defendant guilty of ten of the twelve counts charged in the indictment. Specifically, the jury found defendant guilty of: (i) conspiracy to commit mail or wire fraud (Count 1); (ii) conspiracy to launder monetary instruments (Count 2); (iii) mail fraud (Counts 3-6); and (iv) wire fraud (Counts 7-10). In its verdict form, the jury found defendant guilty of both concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and transactional money laundering, in violation of 18 U.S.C. § 1957. The jury deadlocked on the remaining two counts of aggravated identity theft, following which a mistrial was declared on the ground that there was a manifest necessity to do so. Following this, the government moved to dismiss the aggravated identity theft counts and its motion was granted.

Because defendant was found guilty of Counts 1-10, the question of forfeiture was required to be presented to the jury. Following the parties' arguments on forfeiture, the jury found, in a special forfeiture verdict form:

---

[2] At the time of trial, Mrs. Miller was still serving her 56-month sentence and was in federal custody in Alderson, West Virginia. Although both parties listed Mrs. Miller as a potential witness on their witness lists, the government clarified early on in the trial that it did not intend to call Mrs. Miller as a witness. Because it was revealed that defendant never served Mrs. Miller with a subpoena or took any steps to obtain her presence at trial, the Court ordered the United States Marshals Service to have Mrs. Miller brought to Alexandria so that Mrs. Miller would be available to testify.

3

i. that the net proceeds from the sale of the Fairfax Property[3] constitute proceeds or are derived from proceeds traceable to Count 1 or Counts 3-10;

ii. that the amount of traceable proceeds from the Fairfax Property is $315,317.10;

iii. that the property and improvements at the Bethany Beach Property constitute proceeds or are derived from proceeds traceable to Count 1 or Counts 3-10;

iv. that the amount of traceable proceeds to the Bethany Beach Property is $58,818.35;

v. that the Fairfax Property was involved in the money laundering offense charged in Count 2; and

vi. that the Bethany Beach Property was involved in the money laundering offense charged in Count 2.

On October 9, 2019, the government moved for a preliminary order of forfeiture requiring a forfeiture money judgment of $1,640,665 to be offset by the sale of the Fairfax and Bethany Beach Properties. Defendant opposed the government's motion and the parties argued orally on November 21, 2019.

## II.

Criminal forfeiture for wire and mail fraud offenses is governed by 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). More specifically, § 981(a)(1)C) provides for forfeiture of property "which constitutes or is derived from proceeds traceable to" mail or wire fraud under §§ 1341 or 1343 or a conspiracy to commit the same. Section 982 provides for the criminal forfeiture of property "involved in" money laundering transactions under either 18 U.S.C. § 1956 or § 1957. It also provides for the forfeiture of property "traceable to" any such property. *See* 18 U.S.C. § 982. Importantly, the Fourth Circuit has held, in this case, that, "[p]roperty involved in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property." *United States v. Miller*, 911 F.3d 229, 232 (4th Cir. 2018) (citing *United States v. Kivanic*, 714 F.3d 782, 794 (4th Cir. 2013)).

---

[3] The Fairfax Property has already been sold. Accordingly, the forfeiture of the Fairfax Property relates to the net proceeds obtained following the sale.

4

As an initial matter, the jury returned a special verdict in this case finding that both defendant and his coconspirator used funds from their fraudulent activities that were traceable to the Fairfax and Bethany Beach Properties and that the properties were involved in the money laundering offense. Defendant has not challenged the special verdict on forfeiture through either a rule 29 motion to set aside the verdict or a rule 33 motion for a new trial and the time for doing so has now expired. *See* Fed. R. Crim. P. 29 (motions must be made within 14 days of verdict); Fed. R. Crim. P. 33 (motions on grounds other than newly discovered evidence must be filed within 14 days of verdict).[4] To the extent defendant seeks to challenge the jury's special forfeiture verdict, his opposition to the government's motion for preliminary forfeiture is not the correct procedural vehicle and, in any event, such a challenge would be untimely under Rules 29 and 33, Fed. R. Crim. P.[5]

Additionally, this is not the first time that defendant has challenged the potential forfeiture of his property in this case. In *United States v. Miller*, 911 F.3d 229 (4th Cir. 2018), the Fourth Circuit held:

> Because there is probable cause to find that Miller used fraudulently obtained and laundered funds to make mortgage payments and property tax payments associated with his Virginia property, and that he used funds to pay for improvements to both of his properties, probable cause exists to find that the properties are 'involved in' and 'traceable to' Miller's wire fraud and money laundering charges and are, therefore, forfeitable.

*Id.* at 235. Defendant has now been convicted of mail fraud, wire fraud, conspiracy to commit mail or wire fraud, and conspiracy to commit money laundering and a jury has found that the properties were both traceable to and involved in those offenses. Yet, defendant fails to discuss or even mention the

---

[4] Defendant did not challenge his conviction for conspiracy to commit money laundering (Count 2) in a post-trial motion pursuant to Rule 33, Fed. R. Crim. P, but did not challenge his conviction of any other count or the jury's special forfeiture verdict. On December 6, 2019, an Order issued denying defendant's motion for a new trial on Count 2.

[5] *See United States v. Godoy*, 678 F.2d 84, 88 (9th Cir. 1982) (holding that district court lacked authority to set aside forfeiture verdict where Rule 29 motion would be untimely); *United States v. Dupree*, No. 10-cr-627, 2012 WL 5333946, at *32 (E.D.N.Y. Oct. 26, 2012) (finding that no new trial as to forfeiture verdict warranted where Rule 33 motion was untimely).

Fourth Circuit's decision in this case, nor does he explain why the Fourth Circuit's reasoning with respect to probable cause should not apply now that defendant has been convicted on the fraud and money laundering counts charged in the indictment. Significantly, the Fourth Circuit has already addressed and rejected defendant's argument that, because he did not purchase the properties using fraudulently obtained funds, the properties were not subject to forfeiture. On this point, the Fourth Circuit, in the 2018 appeal, held that "the statutory test does not require so much," noting that "a property involved in a money laundering offense is forfeitable in its entirety." *Miller*, 911 F.3d at 234. Furthermore, the Fourth Circuit found that Ms. Young "did not err in her tracing analysis" and that "[t]he fraud proceeds were . . . 'traceable to' Miller's equity interest" in the properties. *Id.* at 234-35. These holdings are law of the case.[6]

Moreover, the jury's special forfeiture verdict is supported by substantial evidence. The jury found that $58,815.35 in fraud proceeds were traceable to the Bethany Beach Property. The jury also found that $315,317.10 in fraud proceeds were traceable to the Fairfax Property. And, in his closing argument on forfeiture, defendant conceded these amounts.[7] Nor is there any doubt that the record evidence shows that the funds deposited in the CCCAID bank account were intended only for CCCAID and not for the Millers personal use.[8] Similarly, funds from SkyLink and Saslaw were not intended to personally benefit the Millers. The tracing analysis performed by Ms. Young both pretrial and at trial showed that these fraudulent proceeds were then used by defendant and his wife to finance

---

[6] *See United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) ("[T]he doctrine of law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.") (internal quotation marks and alterations omitted); *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (holding that the law of the case doctrine "forecloses relitigation of issues expressly or impliedly decided by the appellate court").

[7] In closing arguments, defendant conceded that: (i) if the jury found a sufficient nexus, then the dollar amount that should be filled in for special verdict interrogatory 1B was either $313,550 or $315,317; and (ii) the government had demonstrated that the $58,000 of CCCAID money was use dot make payments on the Bethany Beach Property.

[8] This includes funds from Bulgarian Tzvetan Vassilev, who defendant testified contributed to CCCAID in order to improve his reputation and to be seen as doing good works.

improvements to the Bethany Beach Property and to pay the mortgage on the Fairfax Property. *See* Govt. Exhs. 21-02, 21-14, and 21-17. Additionally, there is substantial evidence to support the jury's verdict that the Bethany Beach Property and the Fairfax Property were "involved in" money laundering. Specifically, the evidence introduced at trial discloses that fraudulent funds obtained from SkyLink, CCCAID, and Saslaw were moved through various bank accounts controlled by Mrs. Miller before being used by the Millers for improvements related to the Bethany Beach Property and for mortgage payments on the Fairfax property or before being transferred to the Millers' joint personal account and being used for personal expenses. *See* Govt. Exh. 21-17.[9] Bank representatives and Ms. Young testified that there was no reason for the funds to be transferred in such an odd manner. The way these transactions were structured made it more difficult to trace the funds and concealed the source of the funds.[10] The jury's verdict that the Fairfax Property was "involved in" money laundering is also supported by the evidence of transfers in excess of $10,000 that were used to make payments and improvements to the Fairfax Property in violation of 18 U.S.C. § 1957. *See* Govt. Exh. 21-17. Substantial evidence supports the jury's verdict that the Fairfax Property and the Bethany Beach Property both used funds traceable to fraud proceeds and were involved in money laundering.

Defendant further argues that forfeiture is barred by the Supreme Court's decision in *Honeycutt v. United States*, 137 S.Ct. 1626 (2017). In *Honeycutt*, the Supreme Court held that the application of the doctrine of joint and several liability is inconsistent with the statutory language in 21 U.S.C. § 853(a) limiting criminal forfeiture to "proceeds the person obtained." Here, however, there was

---

[9] In order to arrive at the amounts noted in the special forfeiture verdict, the jury clearly must have determined that defendant was involved in the fraudulent schemes involving all three victims – SkyLink, CCCAID, and Saslaw. As demonstrated in the charts included in the final page of government exhibit 21-17, fraudulent funds from all three fraud victims were required by the jury to reach the $315,317.10 figure. *See* Govt. Exh. 21-17, at 12.

[10] *See United States v. Wilkes*, 662 F.3d 524, 547 (9th Cir. 2011) ("Concealing this connection appears to be the dominant, if not the only, purpose of these multi-layered transactions."); *United States v. Thayer*, 204 F.3d 1352, 1354 (11th Cir. 2000) (affirming money laundering conviction where "Lipton funneled profits from VCH to Eurofund and other fictitious business accounts and then eventually to her personal account."); *United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir. 1992) (evidence of a defendant's "convoluted financial dealing" with his banks and in his business "support a conclusion that he intended to disguise the illegal source of his money").

significant evidence showing that defendant obtained funds, including evidence that proceeds were traced to: (i) the Fairfax and Bethany Beach Properties, owned by defendant; (ii) lavish vacations to Jamaica attended by defendant and his wife; (iii) child support obligations of belonging solely to defendant; (iv) country club memberships held by defendant; (v) defendant's sister; and (vi) an employment attorney hired to represent defendant. Additionally, the evidence showed that the defendant played a major role in parts of the conspiracies – namely the efforts to defraud his employer. Courts have held that in such circumstances *Honeycutt* does not apply.[11] Moreover, courts, including the Fourth Circuit have held that *Honeycutt* does not apply to forfeiture under 18 U.S.C. § 982(a)(1), which require forfeiture of property "involved in" money laundering. *See United States v. Alquza*, 722 F. App'x 348, 349 (4th Cir. 2018) (affirming because *Honeycutt* addressed only forfeiture under 21 U.S.C. § 853(a)(1) – which provides for joint and several liability for coconspirators in certain drug crimes – and not forfeiture of property "involved in" money laundering under 18 U.S.C. § 982(a)(1),

---

[11] *See United States v. Leyva*, 916 F.3d 14, 30-31 (D.C. Cir. 2019) (holding that *Honeycutt* does not apply where defendant is a leader of the organization); *United States v. Potts*, 765 F.App'x 638, 640 (3d Cir. 2019) (finding *Honeycutt* did not apply where defendant "a *co-owner of the organization*, received at least $2.4 million in proceeds as a result of *his* participation in the organization" (emphasis in original)); *S.E.C. v. Metter*, 706 F. App'x 699, 702 n. 2 (2d Cir. 2017) (finding that *Honeycutt* did not apply to disgorgement proceedings and that, even if it did apply to disgorgement, it would not apply where defendant "did have control" and "could control the distribution of proceeds"); *United States v. Bangiyev*, 359 F. Supp. 3d 435, 440 (E.D. Va. 2019) (following *Metter* and limiting *Honeycutt* to cases involving incidental figures who did not personally obtain the criminal proceeds; it does not apply to the leaders who obtained all of the money before distributing it among themselves), *aff'd*, 771 F. App'x 328 (4th Cir. 2019); *United States v. Masino*, No. 3:16-cr-17, 2019 WL 1045179, *9 (N.D. Fla. Mar. 5, 2019) (*Honeycutt* does not bar holding leaders of illegal gambling operation jointly and severally liable where they acted in concert in running the operation and deciding how to distribute its proceeds); *S.E.C. v. Amerindo Invest. Advisors, Inc.*, No. 05-cv-5231, 2019 WL 3526590, *3 (S.D.N.Y. Aug. 2, 2019) (even if *Honeycutt* applies to investment fraud cases, defendants who acted jointly in perpetrating the scheme and who jointly obtained the proceeds through a company that they controlled as equal partners remain jointly and severally liable for the forfeiture); *United States v. Ward*, No. 2:16-cr-6, 2017 WL 4051753, *3 (W.D. Mich. Aug. 24, 2017) (leader of a drug organization "obtains" the gross proceeds of the drug offense, even if some of the money is actually received by his employees; *Honeycutt* does not limit his liability to the money that comes into his own hands), *rpt & recommendation adopted*, 2017 WL 3981160, (W.D. Mich. Sep. 11, 2017), *aff'd on other grounds*, 757 F. App'x 507 (6th Cir. 2019); *United States v. McIntosh*, No. 11-cr-500, 2017 WL 3396429, *5-6 (S.D.N.Y. Aug. 8, 2017) (notwithstanding *Honeycutt*, when defendants act in concert, jointly acquiring proceeds and dividing them among themselves by joint decision, they each remain liable to forfeit the total proceeds).

the basis on which the district court ordered forfeiture").[12] Accordingly, *Honeycutt* does not bar the entry of the preliminary forfeiture order or forfeiture of the subject properties.

### III.

Defendant also challenges the amount of the money judgment proposed by the government. As discussed above, the jury found via a special verdict that the Fairfax and Bethany Beach Properties are subject to forfeiture. Pursuant to Rule 32.2, after property is determined to be subject to forfeiture, the court "must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment . . . and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A). The amount of any money judgment must be proved by a preponderance of the evidence. *See United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011). Moreover, the forfeiture amount may be based on a reasonable estimate of the proceeds derived. *See, e.g., United States v. Roberts*, 660 F.3d 149, 165-66 (2d Cir. 2011). Here, the United States calculates a total money judgment of $1,640,665, which is based on (i) $619,025 in fraud proceeds from CCCAID; (ii) $368,350 in fraud proceeds from SkyLink; and (iii) $653,290 in fraud proceeds from Saslaw. *See* Govt. Exhs. 21-02, 21-04, 21-05. Defendant argues that the fraud proceeds attributable to CCCAID should only be the amounts contributed by the community colleges -- $83,600 – and that none of the Saslaw proceeds are attributable to defendant.[13] Defendant is plainly wrong, however, and the government has correctly calculated the appropriate money judgment.

The correct calculation of fraud proceeds from CCCAID is $619,025. Witnesses, including defendant, testified that Bulgarian Tzvetan Vassilev contributed $500,000 to CCCAID in order to

---

[12] *See also United States v. Fujinaga*, No. 2:15-cr-198, 2019 WL 2503939, at *5 n.1 (D. Nev. Jun. 17, 2019) (holding *Honeycutt* does not apply to forfeiture of property "involved in" money laundering pursuant to 18 U.S.C. § 982(a)(1)); *Cf. United States v. Bikundi*, 926 F.3d 761, 794 (D.C. Cir. 2019) (finding that it is unclear that *Honeycutt* extends to forfeiture under 18 U.S.C. § 982(a)(1) and declining to address the issue because the funds were "jointly obtained").

[13] Defendant does not contest the figures related to SkyLink or that they are appropriately considered with respect to forfeiture.

improve his image and reputation, not to provide funds to defendant and his wife for their personal use.[14] Moreover, the funds contributed by Mr. Vassilev were deposited into CCCAID's bank account. At trial, witnesses testified that CCCAID was a consortium of member colleges and that the funds contributed and deposited into CCCAID's bank account were intended to be spent on lobbying on behalf of, and programs for, the colleges. Thus, the money belonged to CCCAID and not to the Millers personally. The funds contributed by Mr. Vassilev and used by the Millers are thus appropriately included in the money judgment against defendant. Defendant also argues that Mrs. Miller was entitled to take a salary from CCCAID. Yet, the evidence at trial was that Mrs. Miller was a volunteer at CCCAID, that there had been some discussions concerning providing her with a salary but no decision had been made, and the funds used by the Millers from the CCCAID account could not be construed as regular salary payments. Defendant does not even suggest what Mrs. Miller's "salary" from CCCAID might have been. Instead, he argues conclusorily that Mrs. Miller "was entitled to compensation" *ipso facto* "there were real expenses attributable" to CCCAID. Opp'n at 2 (Dkt. 150).[15] No evidence in the record supports the argument that Mrs. Miller was entitled to any compensation from CCCAID, let alone the $619,025 that defendant and his wife fraudulently obtained from CCCAID. Finally, defendant argues that $150,000 in payments from Taft College were not contributions but payments for a separate venture, namely the New Market Tax Credit ("NMTC"). The jury was free to disbelieve defendant's testimony to that effect. Moreover, evidence at trial established: (i) that the NMTC contract was between Taft College and defendant's stepson; (ii) that the contract was before the conception of CCCAID; (iii) that the NMTC payments were separate and

---

[14] Defendant testified that Mr. Vassilev's contributions to CCCAID ($500,000) were separate and apart from the consulting fees that defendant claimed that he earned and received ($900,000) for work performed for Mr. Vassilev.

[15] Defendant's testimony at trial also belies any assertion that Mrs. Miller was receiving compensation. Defendant testified that he was unaware whether Mrs. Miller was receiving compensation. Other witnesses testified that, although there was some discussion about compensating Mrs. Miller, no decision was ever forthcoming and no agreement setting forth the terms of her compensation was ever signed.

apart from Taft College's payments to CCCAID; and (iv) that the funds in the CCCAID bank account were for CCCAID. Accordingly, all of the CCCAID funds ($619,025) are properly considered fraud proceeds.[16]

The government has also correctly calculated the Saslaw funds as fraud proceeds whose loss is attributable to defendant. To begin with, defendant argues that "we will never know whether the jury believed [defendant] was involved in his wife's embezzlement of the Saslaw campaign money." Opp'n at 3 (Dkt. 150). On the contrary, the jury's special forfeiture verdict reveals that the jury believed that defendant was involved in defrauding all three victims discussed at trial – SkyLink, CCCAID, and Saslaw – because it could not have reached the figures included on the special verdict form unless funds from all three victims were included. *See* Govt. Exh. 21-17, at 12.[17] Moreover, defendant concedes that he benefitted from the spending of the funds. The Saslaw funds: (i) were obtained at a time when defendant had no legitimate income;[18] (ii) were deposited into accounts owned by fictitious entities created by defendant to defraud his former employer; and (iii) were used on behalf of defendant. That the same fictitious entities – Federal Legislative Associates and The Straile Group – that were used to defraud SkyLink[19] were also used to defraud Saslaw for the same purpose – i.e. to

---

[16] Defendant, in his third opposition to the motion for preliminary forfeiture (Dkt. 168), argues that "for all intents and purposes CCCAID was Mrs. Wallis-Miller." Opp'n at 7. Defendant cites no authority establishing that Mrs. Miller was the alter ego. Moreover, in the District of Columbia Circuit case cited by defendant, the D.C. Circuit reversed a district court's finding of alter ego. *See United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015). Here, Mrs. Miller was not the same as CCCAID. CCCAID had a president and the contributing colleges were all members. There was no evidence that Mrs. Miller was authorized to make independent decisions on behalf of CCCAID nor was there any evidence that she was authorized to draw a salary from CCCAID. Moreover, CCCAID did not hold itself out to be for the benefit and use of Mrs. Miller and was in existence before Mrs. Miller had a formal role in the organization. It is also clear that the jury did not believe that Mrs. Miller was entitled to a salary.

[17] The tracing analysis performed by Ms. Young demonstrated: (i) that $138,783.32 in CCCAID proceeds were traced to the Fairfax Property; (ii) that $96,199.40 in Saslaw proceeds were traced to the Fairfax Property; and (iii) that $80,334.38 in SkyLink proceeds were traced to the Fairfax Property. Together, those funds total $315,317.10 – the exact figure reached by the jury.

[18] Defendant was not employed by SkyLink during most of the time period that the Saslaw scheme was happening.

[19] While defendant refused to call the SkyLink scheme fraud, defendant testified that his use of these fictitious entities was deceitful and that he created them to obtain money from SkyLink beyond his regular salary and bonus. Evidence at trial also demonstrated that Mrs. Miller was intimately involved in this scheme.

pay the Millers' bills and lavish expenses – is powerful evidence that it was part of the same conspiracy between defendant and his wife. Accordingly, the government correctly calculates that $653,290 in Saslaw funds are fraud proceeds attributable to defendant.

In sum, the government correctly calculated the proposed money judgment at $1,640,655. All of the fraudulent funds obtained from the three victims of defendant's crimes – SkyLink, CCCAID, and Saslaw – are appropriately considered and included when calculating an appropriate money judgment and forfeiture.

### IV.

Defendant next makes a cursory argument that a money judgment of $1,640,665 violates the Eighth Amendment's prohibition on excessive fines. A punitive fine violates the Eighth Amendment if "it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 323 (1998). The Fourth Circuit has directed district courts to look at four factors when examining whether a forfeiture is "grossly disproportionate":

> (1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the crime charged and other crimes; and (4) the harm caused by the charged crime.

*United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014).[20]

An analysis of these factors demonstrates that the forfeiture proposed by the government is plainly not excessive. First, because all of the fraud proceeds from SkyLink, CCCAID, and Saslaw are attributable to defendant, the maximum authorized fine for Count 1 alone is $3,281,330 (i.e. $1,640,655 times two). *See* 18 U.S.C. § 3571(d).[21] Second, defendant conspired to defraud multiple

---

[20] Defendant cites to a case from the Middle District of Alabama and a case from the Southern District of Florida which set forth other factors that district courts may consider. *See United States v. One Parcel Property Located at 427 and 429 Hall St., Montg., Ala.*, 853 F. Supp. 1389 (M.D. Ala. 1994); *United States v. One Parcel Property of Real Estate Located at 13143 S.W. 15th Lane, Miami, Fla.*, 872 F.Supp. 968 (S.D. Fla. 1994). Those cases are not binding on the Court, however, and do not apply Fourth Circuit jurisprudence.

[21] Defendant argues that the appropriate focus is the $58,000 in proceeds traceable to the Bethany Beach Property. But the more appropriate focus is to look at the entirety of the fraud proceeds for which forfeiture is permissible.

victims across a four-year period in organizations where he or his wife were in positions of trust, including: (i) his employer – where he was General Counsel and Chief Compliance Officer; (ii) CCCAID which he founded and for which his wife volunteered; and (iii) the Saslaw Campaign – in which his wife was the Treasurer. The nature of the crime is made more brazen by defendant's status as a lawyer and the lengths to which defendant went to attempt to conceal his fraud, namely his creation of fictitious entities, his creation of fake emails,[22] and his manipulation of SkyLink's corporate policies.[23] Defendant's role in the conspiracy was not minimal – in fact he arguably played the most important role by founding CCCAID to solicit funds, by creating the Federal Legislative Associates and the Straile Group, and by leading the effort to defraud SkyLink. Third, defendant was charged with both a fraud conspiracy and a money laundering conspiracy and was convicted of both. Finally, the victims sustained losses which combined amount to $1,640,665. Additionally, the frauds perpetrated by the Millers undermine confidence in members of the bar, volunteers in political organizations, and public trust in organizations lobbying for the disabled. Courts have found similar forfeitures not to be excessive.[24] Accordingly, the forfeiture of $1,640,665 does not violate the Eighth Amendment.

---

[22] As part of the scheme to defraud SkyLink, the defendant and his wife sent emails that purported to be from persons at the fictitious Federal Legal Associates or The Straile Group entities in order to fraudulently obtain funds from SkyLink. Indeed, the government introduced evidence of one instance in which defendant posing as a person at one of these fictitious entities sent an email from his SkyLink email account rather than the email associated with the fictitious entity. The government also introduced evidence that draft copies of the invoices for the fictitious entities attached to the emails from these nonexistent persons were found on defendant's SkyLink computer.

[23] Defendant – the General Counsel and Chief Compliance Officer of SkyLink – manipulated corporate policies in two ways. First, there was evidence that defendant failed to notify SkyLink of his outside business with Mr. Vassilev, CCCAID, the Straile Group, and Federal Legal Associates as required. Second, defendant informed the other members of the Legal Department and other persons at SkyLink that Federal Legal Associates and the Straile Group were not required to prepare and submit the detailed activity reports required of other outside counsel and law firms.

[24] *United States v. Matai*, 173 F.3d 426, at *5 n. (4th Cir. 1999) (finding that forfeiture of inventory of clothing store as property used to facilitate money laundering was not excessive even though defendants only laundered $11,000); *United States v. Aguasvivas-Castillo*, 668 F.3d 7, 16-17 (1st Cir. 2012) (forfeiture of $20 million was not grossly disproportionate given $4.4 million food stamp fraud); *United States v. Bikundi*, 926 F.3d 761, 795-96 (D.C. Cir. 2019)( affirming forfeiture of $40 million involved in money laundering under *Bajakajan* factors).

\* \* \*

In sum, fraud proceeds were traceable to the properties and the properties were involved in money laundering. The government, based on the tracing analysis performed by Ms. Young, has correctly calculated the amount of the fraud proceeds obtained by defendant and for which a money judgment should be entered. Additionally, the proposed money judgment is not grossly disproportionate to the criminal conduct and does not violate the Eighth Amendment's bar on excessive fines.

V.

Accordingly, for the reasons set forth above and for the reasons stated from the bench on November 21, 2019, a preliminary order of forfeiture is appropriate, and the government's motion is granted.

The Clerk of Court is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
December 12, 2019

/s/
T. S. Ellis, III
United States District Judge

14